

FEB 18 2014

# United States District Court
## NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

TERRY EUGENE PEACE, BRIAN EDWARD CANNON
AND CORY ROBERT WILLIAMSON

**CRIMINAL COMPLAINT**

Case Number: 4:14-MJ-10

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning on or about January 23, 2014 and continuing until February 15, 2014, in Floyd County, in the Northern District of Georgia, the defendants, TERRY EUGENE PEACE, BRIAN EDWARD CANNON and CORY ROBERT WILLIAMSON, and others known and unknown, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and others, to violate Title 26, United States Code, Section 5861, that is, the defendants conspired to receive and possess firearms, that is, destructive devices, which were not registered to the defendants in the National Firearms Registration and Transfer Record, all in violation of Title 18, United States Code, Section 371. The object of the conspiracy was to unlawfully obtain pipe bombs and thermite devices.

I further state that I am a Federal Bureau of Investigations Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

_____
Signature of Complainant
Adam Rowland

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

February 18, 2014                                  at   Rome, Georgia
Date                                                     City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                 Signature of Judicial Officer
AUSA Tracia M. King, Ryan K. Buchanan / 2014R00101

# AFFIDAVIT

I, Adam Rowland, being first duly sworn, do hereby depose and state:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been since October 2005. I am assigned to the FBI Office in Atlanta, Georgia, and work in the Rome Resident Agency ("RRA"), which is a satellite office of the Atlanta Office located in Rome, Georgia. At the FBI RRA, I investigate a variety of federal offenses, including domestic terrorism. I am also an Assistant Weapons of Mass Destruction Coordinator for the Atlanta Division of the FBI.

2. This affidavit is prepared in support of a Criminal Complaint charging that beginning at least on or about January 23, 2014 and continuing until February 15, 2014, in the Northern District of Georgia, the defendants, TERRY EUGENE PEACE, BRIAN EDWARD CANNON and CORY ROBERT WILLIAMSON, and others known and unknown, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and others, to receive and possess firearms, that is, destructive devices, which were not registered to the defendants in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Section 5861, all in violation of Title 18, United States Code, Section 371. The object of the conspiracy was to unlawfully obtain pipe bombs and thermite devices.

3. This Affidavit contains information necessary to support probable cause for the issuance of the Criminal Complaint, and is not intended to include each and every fact and matter observed by me or known to the government.

## Overview of the Investigation

4. Between on January 23, 2014, and on or about February 15, 2014, PEACE, CANNON and WILLIAMSON participated in online chat discussions, which were monitored by FBI, during which they chatted about carrying out an operation against the government. Specifically, during on online chat on or about January 23, 2014, PEACE spoke about a mission that was to be launched in February against the government. PEACE encouraged members of the militia to review guerilla warfare tactics, small unit tactics, accumulate supplies, and prepare family. PEACE advised that "guerilla warfare primary targets included TSA, DHS, non-emergency FEMA, road blocks, etc."

5. An FBI confidential human source (CHS-1)[1] advised FBI that CHS-1 was going to attend a meeting with PEACE in Memphis on February 5, 2014. The purpose of the meeting was to discuss this mission. On February 5, 2014, WILLIAMSON telephoned CHS-1 and advised that he was with CANNON and PEACE in Memphis. Because they were tired of waiting, WILLIAMSON stated that they were leaving and that CHS-1 should go home. WILIAMSON further stated that

---

[1] CHS-1 does not have any prior felony convictions or any pending charges. CHS-1 is providing information voluntarily and not in consideration of any potential criminal charges. CHS-1 has received compensation from FBI. As described further in this Affidavit, agents have been able to corroborate much of the information that CHS-1 has provided.

"they" would contact CHS-1 via a secured, encrypted chat site to discuss the meeting.

6. Cellular telephone records were obtained for the telephone number utilized by WILLIAMSON on February 5, 2014. The records establish that the call originated in western Tennessee. Additionally, cell tower records further show that WILLIAMSON's cellular phone traveled from Tennessee to Rome, Georgia on February 5, 2014.

7. On February 5, 2014, PEACE requested information to access the secured chat site, which occurred on that day. FBI Agents were present with CHS-1 and observed CHS-1 chat using www.chatcrypt.com. FBI Agents observed that there were only three participants to this chat: CHS-1, a person using the moniker "Chief," and one other person. These chats were preserved as evidence.

8. During this monitored conversation, Chief wrote, "We will be using Guerrilla style warfare tactics. I have been arguing with myself on what level of violence or what level of damage is acceptable. I do not want to kill or injure fellow Americans. So, at least for the guys with me we will restrain the violence toward people and target infrastructure. Then respond to violence with reciprocal violence."

9. Chief further stated, "The group with me will move first mainly to make a point. I stand by what I say. The other groups should start within the next 24 – 48 hours in order to keep the operational tempo up so that when one unit is done another

is hitting nonstop. As soon as we complete mission one, we will relocate and start mission 2 then 3, until all is done."

10. Chief additionally stated, "We will get a post up after we complete our mission, then you will know the clock is started."

11. As the online conversation continued, Chief talked about training, attacking small targets first, and then escalating to larger targets. Chief then described infrastructures as government vehicles, buildings, power, and communication. As the chat continued, Chief wrote, "if we can get decent intelligence could be obtained on roadblocks or VIPR etc, then we go after them with the understanding it would be violent."

12. Additionally, on February 6, 2014, FBI conducted surveillance at PEACE's residence located in Rome, Georgia. During the surveillance, three males were observed getting into a vehicle and driving away from the residence. The tag on this vehicle is registered to WILLIAMSON. The vehicle traveled to the Russell Field Airport. The vehicle turned around, departed abruptly and returned to PEACE's residence. Based on the Affiant's experience and training, and the observations of other FBI Agents, this method of driving indicated the use of surveillance detection techniques.

13. On February 6, 2014, during an online chat between CHS-1 and WILLIAMSON, WILLIAMSON made reference to items he needed for this mission. When CHS-1 and WILLIAMSON discussed whether the group needed ammunition and explosives, WILLIAMSON advised that WILLIAMSON was not certain but that he believed it was covered. WILLIAMSON then stated that he would ask,

unless CHS-1 had resources to share.  CHS-1 advised that CHS-1 was not certain, but CHS-1 would ask his contact.

14. On February 7, 2014, during an online chat between CHS-1 and PEACE, CHS-1 told PEACE that CHS-1 gave WILLIAMSON information to pass on PEACE. After PEACE acknowledged that he received the message, he asked how CHS-1 would like to communicate. CHS-1 advised PEACE to call CHS-1.

15. On February 8, 2014, during a recorded telephone call, CHS-1 advised PEACE that CHS-1 had a contact that could provide the group with what it needed. CHS-1 further advised PEACE that its contact wanted to know what the group needed the device to do so the contact would know what to make.  PEACE responded that he needed "a thermite charge to go through the engine block of an MRAP." PEACE stated that most sheriffs and police departments have one or two.

16. Through open source research, I learned that a "MRAP" is a mine-resistant ambush protected vehicle, or an armored fighting vehicle.

17. Additionally during the February 8, 2014, recorded call, after CHS-1 advised PEACE that CHS-1 was writing down what PEACE requested, PEACE stated, "... if he can hook us up with say 12 pipe bombs that will be sweet." PEACE additionally added that PEACE wanted the pipe bombs constructed for "maximum fragmentation."

18. When CHS-1 expressed that the contact may not be comfortable meeting or talking to PEACE, PEACE stated that CHS-1 could be the middleman.  PEACE

also advised CHS-1 that he would like to get these items within the next seven days.

19. On February 8, 2014, a FBI surveillance team determined that PEACE, CANNON and WILLIAMSON were located at PEACE's residence during this call.

20. A second FBI confidential human source (CHS-2)[2] reported to FBI that on February 8, 2014, CHS-2 and CANNON had a conversation in which CANNON stated that "the group" was planning to "start the fight" with the government by strategically planning to sabotage power grids, transfer stations, and water treatment facilities.[3] CANNON claimed this action would cause mass hysteria and if enough sabotage was successful, then martial law would be declared therefore triggering other militias to join the fight. CANNON claimed too many militias were in a defensive mode and in order to get them out of the defensive posture, actions would have to take place to force martial law to be declared.

21. CANNON advised that CANNON would invite CHS-2 to join a private Facebook chat where plans were being made. CANNON expressed a desire to recruit members from different regions of the United States to carry out these missions.

---

[2] CHS-2 does not have any prior felony convictions or any pending charges. CHS-2 is providing information voluntarily and not in consideration of any potential criminal charges. Moreover, CHS-2 provided information independently from CHS-1.

[3] This communication was not recorded.

22. On February 9, 2014, CHS-1 called CANNON and asked to speak to PEACE. CHS-1 further advised that CHS-1 had information for PEACE. CANNON responded that PEACE will be "elated." After PEACE came to the phone, CHS-1 advised PEACE that the contact can make the requested items, but that it will take a few days. PEACE replied that it was not a problem. PEACE told CHS-1 to let him know when the items are ready and that "they will head up there" to get them. PEACE and CHS-1 then spoke about meeting in Tennessee for delivery of the items to PEACE.

23. On February 13, 2014, PEACE, CANNON, WILLIAMSON, and an unknown subject traveled to a store named Country Sportsman, located in Rome, Georgia. All four entered the store. CANNON looked at a .308 caliber Mossberg rifle. CANNON commented that he was interested in this particular rifle because it has a threaded barrel which would allow him to attach a silencer. CANNON completed an ATF Form 4473, but changed his mind about the purchase. PEACE then presented his gun permit and purchased the Mossberg rifle. PEACE also purchased a vortex rifle scope, a hard gun case, a bi-pod, and rings used to attach the scope. CANNON asked the store clerk for a certain kind of ammunition. After the store clerk advised that the store didn't carry the requested ammunition, CANNON advised that he already had ammunition.

24. A FBI surveillance team observed that the vehicle in which the four subjects traveled returned to PEACE's residence. The four subjects exited the vehicle. One person removed items from the vehicle and all four entered the residence.

25. On February 15, 2014, CHS-1 spoke to CANNON to advise CANNON and the others that CHS-1 was in Georgia with the items PEACE requested from CHS-1. Although they previously agreed to meet in Tennessee, it was subsequently decided that they would meet in Georgia. CHS-1 and the others decided on a meeting location in Cartersville, Georgia.

26. Prior to the meeting, FBI provided CHS-1 with twelve (12) inert pipe bombs and two (2) thermite devices, which were the items CHS-1 agreed to provide pursuant to PEACE's request.

27. On that same date, a FBI surveillance team observed subjects at PEACE's residence loading rifles into a truck. PEACE, CANNON and WILLIAMSON got into the truck and drove to Cartersville, Georgia. Upon arriving in Cartersville, a FBI surveillance team observed the truck perform several surveillance detection maneuvers.

28. Upon arriving at the designated meeting place in Cartersville, PEACE, CANNON and WILLIAMSON exited the truck and walked over to CHS-1. After CHS-1 placed a box containing the thermite devices into the subjects' truck, CHS-1 pulled out instructions for the thermite devices and began to read them. CHS-1 then handed the instructions to PEACE.

29. As CHS-1 went to retrieve another box to place inside the subjects' truck, PEACE, CANNON and WILLIAMSON were taken into custody. During a search incident to arrest, agents observed three rifles in the cab of the truck. A search of PEACE and CANNON revealed that they were also armed with

pistols. Additionally, PEACE was wearing body armor and CANNON was wearing a tactical carrier for body armor.

30. A check of the National Firearm Registration and Transfer Record establish that, as of February 14, 2014, PEACE, CANNON and WILLIAMSON are not registered to possess any destructive devices.

31. Based on the foregoing, I submit there is probable cause to believe that beginning at least on or about January 23, 2014 and continuing until February 15, 2014, in the Northern District of Georgia, the defendants, TERRY EUGENE PEACE, BRIAN EDWARD CANNON and CORY ROBERT WILLIAMSON, and others known and unknown, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and others, to receive and possess firearms, that is, destructive devices, which were not registered to the defendants in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Section 5861, all in violation of Title 18, United States Code, Section 371. The object of the conspiracy was to unlawfully obtain pipe bombs and thermite devices.