IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

TERRY EUGENE PEACE,

Defendant.

CRIMINAL ACTION FILE
NO. 4:14-CR-11-HLM-WEJ-1

## NON-FINAL REPORT AND RECOMMENDATION

When defendant, Terry Eugene Peace, along with his co-defendants, Brian Edward Cannon and Cory Robert Williamson, assumed possession of decoy explosives delivered to them by a government informant, police swiftly moved in and arrested them. Mr. Peace seeks to have the Court exclude from evidence statements he subsequently made to law enforcement during custodial interrogation. (See Mot. to Suppress Statements [45].)[1] To receive evidence regarding defendant's testimonial statements to police, the Court conducted an evidentiary hearing [58] on May 29, 2014. That hearing has been transcribed [59], and the parties have

---

[1] Defendant withdraws his Motion to Suppress Evidence Resulting from Execution of Search Warrant [46, 56]. (Def.'s Br. [62] 1 n.1.) Therefore, the undersigned **RECOMMENDS** that the Court **DENY** that motion as **MOOT**.

competently briefed the legal issues raised. (See Def.'s Br.; Gov't Resp. [64]; Def.'s Reply [65].)

On the basis of the testimony and documentary evidence produced at that hearing and the briefs of counsel, the undersigned **REPORTS** that from 2:44 p.m. until 3:14 p.m. on February 15, 2014, police lawfully conducted custodial interrogation of Mr. Peace under the public safety exception to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).[2] The undersigned further **REPORTS** that the subsequent evening interview, which followed <u>Miranda</u> warnings and defendant's knowing and voluntary waiver of his rights, was not constitutionally defective under <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). Accordingly, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [45] be **DENIED**.

---

[2] The government will not seek to introduce in its case-in-chief any testimony that Mr. Peace provided police between 3:14 p.m. and 3:39 p.m on February 15, 2014 (i.e., after FBI Special Agent Jason Harris provided Mr. Peace with an incomplete rendition of his <u>Miranda</u> rights and Mr. Peace invoked his right to an attorney). (Gov't Resp. 5 n.2.) Accordingly, the undersigned **RECOMMENDS** that the Court **DENY** as **MOOT** defendant's request to suppress statements made during that interval.

AO 72A
(Rev.8/82)

## I.     STATEMENT OF FACTS

### A.     Investigation Leading to Defendant's Arrest

In early 2014, Messrs. Peace, Cannon, and Williamson (collectively "defendants"), members of a militia, used the Internet to communicate with unnamed individuals not indicted with defendants. (Mag. Compl. Aff. [1] ¶ 4.) Online chats do not usually attract the attention of the Federal Bureau of Investigation, but in this instance defendants were broadcasting their intent to engage the government in a guerilla war. (Id.) On January 23, the FBI observed that Mr. Peace used an Internet forum to promote an anti-government mission that would launch in February. (Id.) He encouraged members of the militia to review guerilla warfare and small unit tactics, accumulate supplies, and prepare their families for the coming showdown. (Id.) The hit list included the Department of Homeland Security and two of its agencies, the Transportation Security Administration and the Federal Emergency Management Agency. (Id.)

A "confidential human source" ("CHS-1") informed the FBI that he had arranged to meet Mr. Peace in Memphis, Tennessee, on February 5 to discuss the anti-government revolt. (Mag. Compl. Aff. ¶ 5.) Defendants traveled to Memphis, but when they got there they grew "tired of waiting" for CHS-1 and turned around

3

for home.  (Id.)  Mr. Williamson told CHS-1 they would instead confer via an encrypted chat site.  (Id.)

That same day, Mr. Peace requested information to access a secured chat site. (Mag. Compl. Aff. ¶ 7.)  The FBI was present with CHS-1 as the confidential source accessed the same site.  (Id.)  During the monitored conversation, a person using the moniker "Chief" wrote:

> We will be using Guerrilla style warfare tactics.  I have been arguing with myself on what level of violence or what level of damage is acceptable.  I do not want to kill or injure fellow Americans.  So, at least for the guys with me we will restrain the violence toward people and target infrastructure.  Then respond to violence with reciprocal violence.

(Id. ¶ 8.)

> The group with me will move first mainly to make a point.  I stand by what I say.  The other groups should start within the next 24 - 48 hours in order to keep the operational tempo up so that when one unit is done another is hitting nonstop.  As soon as we complete mission one, we will relocate and start mission 2 then 3, until all is done.

(Id. ¶ 9.)  "We will get a post up after we complete our mission, then you will know the clock is started."  (Id. ¶ 10.)

"Chief" also discussed training and strategy; the militias would attack small targets first and graduate to larger targets.  (Mag. Compl. Aff. ¶ 11.)  Targeted

infrastructure included "government vehicles, buildings, power, and communication." (Id.) "If we can get decent intelligence . . . on roadblocks or VIPR,[3] then we go after them with the understanding it would be violent." (Id.)

On February 6, CHS-1 and Mr. Williamson communicated online about defendants' need for ammunition and explosives to carry out their mission. (Mag. Compl. Aff. ¶ 13.) When Mr. Williamson inquired whether CHS-1 had "resources to share," CHS-1 stated that he was uncertain but would ask a "contact." (Id.) On February 7, CHS-1 asked Mr. Peace to call him. (Id. ¶ 14.) The next day, on the telephone with Mr. Peace, CHS-1 related to defendant that the contact could provide defendants their desired armaments. (Id. ¶ 15.) So that the contact could manufacture appropriate devices, CHS-1 asked Mr. Peace what he intended to do with the devices. (Id.) Mr. Peace responded that he needed "a thermite charge to go through the engine block of an MRAP."[4] (Id.) He also requested a dozen pipe bombs "constructed for maximum fragmentation." (Id. ¶ 17.) CHS-1 informed Mr.

_____

[3] VIPR stands for Visible Intermodal Prevention and Response. See 6 U.S.C. § 1112(a) (authorizing the Secretary, acting through the Administrator of the Transportation Security Administration, to develop VIPR teams to augment the security of any mode of transportation at any location within the United States).

[4] MRAP stands for "mine-resistant ambush protected" vehicle. (Mag. Compl. Aff. ¶ 16.)

AO 72A
(Rev.8/82)

Peace that his contact might be uncomfortable meeting with or directly speaking to defendant. (Id. ¶ 18.) Mr. Peace suggested that CHS-1 serve as a middleman between the two. (Id.)

A second FBI source ("CHS-2") conversed with Mr. Cannon on February 8. (Mag. Compl. Aff. ¶ 20.) Mr. Cannon told CHS-2 that the group was planning to "'start the fight' with the government" by sabotaging power grids, transfer stations, and water treatment facilities. (Id.; Tr. 31.) He also professed his desire to recruit new militia members from different parts of the country to assist the anti-government mission. (Mag. Compl. Aff. ¶ 21.) Mr. Cannon believed that the attacks would prompt mass hysteria, and that if enough sabotage was successful, martial law would be declared. In turn, this would cause the many militias in defensive mode to join the anti-government offensive. (Id. ¶ 20; Tr. 32.)

On February 9, CHS-1 telephoned Mr. Peace to tell him that he would have the destructive devices in a few days. (Mag. Compl. Aff. ¶ 22.) On February 13, defendants traveled to the Country Sportsman in Rome, Georgia, and purchased a rifle and accessories. (Id. ¶ 23.) On February 15, CHS-1 informed Mr. Cannon that he was in Georgia with the devices. (Id. ¶ 25.) CHS-1 agreed to meet defendants later that day in Cartersville, Georgia. (Id.) Before the meeting, the FBI provided

6

CHS-1 with twelve inert pipe bombs and two thermite devices to deliver to defendants.  (Id. ¶ 26.)

Upon arriving at the designated meeting place, a Walmart parking lot, defendants exited their vehicle and approached CHS-1.  (Mag. Compl. Aff. ¶ 28.) CHS-1 placed a box containing the thermite devices into defendants' truck and pulled out instructions, which he read aloud and handed to Mr. Peace.  (Id.)  As CHS-1 went to retrieve another box to place in defendants' truck, agents arrested defendants and reclaimed the decoy explosives.  (Id. ¶ 29; Tr. 34.)

During a search incident to arrest, officers discovered pistols on Messrs. Peace and Cannon and three rifles in the cab of the truck.  (Mag. Compl. Aff. ¶ 29.)  Mr. Peace was wearing body armor and Mr. Cannon was wearing a tactical carrier for body armor.  (Id.)  None of defendants was registered on the National Firearm Registration and Transfer Record to possess a destructive device.  (Id. ¶ 30.)

## B.     The Afternoon Interview

After their arrest at approximately 1:35 p.m., officers transported defendants to the Bartow County Sheriff's Office in Cartersville.  (Tr. 9, 20.)  Mr. Peace was deposited in an interview room at 2:03 p.m.  (Id.)  Although Agent Harris was present throughout the afternoon interview, the task of questioning Mr. Peace fell to

Captain Mark Mayton.[5] (Id. at 8-9.) As a member of the FBI's task force, Captain Mayton had worked the investigation leading to defendants' arrest. (See id. at 5.) Before interrogating Mr. Peace, Captain Mayton reviewed evidence obtained by the FBI. (Id.) In that way, he discovered that defendants had traveled to Cartersville to purchase "shrapnel-type" bombs and thermite devices.[6] (Id. at 5-6.) After discussing the case with agents and reading screen shots of online chats, Captain Mayton determined that defendants' acquisition and use of these destructive devices was intended to be "a catalyst for . . . other groups to begin similar-type operations" around the country, namely "[t]he destruction of infrastructure" and "violent encounters with law enforcement." (Id. at 7-8; see also id. at 28, 30-32.) Since the FBI's evidence did not apprise Captain Mayton of the "exact plans" of other militias, he did not have the information necessary to prevent any attacks planned by these groups. (Id. at 48.)

---

[5] Captain Mayton, a twenty-five-year veteran of the Bartow County Sheriff's Office, is the commander of the Bartow/Cartersville Drug Task Force and a member of the FBI's Northwest Georgia Criminal Enterprise Task Force. (Tr. 4-5.)

[6] According to Captain Mayton, who admitted having "limited knowledge" of explosives, shrapnel bombs are designed to inflict "bodily harm and maximum damage." (Tr. 6.)

AO 72A
(Rev.8/82)

FBI Special Agent Micah Childers, who did not participate in the afternoon interview, had previously determined that the apprehension of defendants posed an "emergency situation." (Tr. 69.) He therefore directed Captain Mayton to question Mr. Peace without first reading him <u>Miranda</u> warnings, feeling they were "good to go on the public safety exception." (<u>Id.</u> at 68-69.) Consistent with Agent Childers's directive, Captain Mayton approached the interview as an opportunity to "gain information that would prevent any potential . . . public safety hazards" to civilians and law enforcement personnel. (<u>Id.</u> at 11; <u>see also</u> <u>id.</u> at 25-26, 48-49.) He was also troubled by the dangers officers could face in executing a search warrant at defendant's residence. (<u>Id.</u> at 12, 14-15.) Thus, the purpose of the interview was also "to curtail any hazards to [the] law enforcement personnel that would be responding to the search warrant." (<u>Id.</u> at 12.)

Captain Mayton was present for the controlled delivery at Walmart, but did not question Mr. Peace in the parking lot or during defendant's ride to the Sheriff's Office. (Tr. 19-22.) Instead, he waited to begin the interview until 2:44 p.m., approximately forty minutes after Mr. Peace arrived at the Sheriff's Office. (<u>Id.</u> at 9-10.) At the outset, Captain Mayton advised Mr. Peace that he would not question him about the events surrounding his arrest. He was purely "concerned about things

9

that could happen, future events, people getting hurt, . . . public safety." (Gov't Ex. 1, at 2:45:03-10.[7])  The Captain then asked defendant to "lay it out to [him]:  what the plans were, who they involved, where they're at."  (Id. at 2:45:47-53; see also id. at 2:50:32-38 ("I would specifically like to know about any other people affiliated with you, what their intents are, what their targets are.").)

To ensure there would not be "any problems" with the interrogation, Mr. Peace called to the officers' attention their failure to Mirandize him.  (Gov't Ex. 1, at 2:45:57-46:00.)  Implying that warnings were not forthcoming, Captain Mayton explained, "I'm not particularly asking you about your crime today.  I'm interested in anything that prevents somebody from getting hurt."  (Id. at 2:46:04-10; see also id. at 2:45:27-34 ("I'm not particularly interested in anything that happened today. I'm interested in future events, future problems."); id. at 2:50:09-16 ("My motivation right now is to stop any or learn about any other incidences where innocent people can get hurt."); id. at 3:03:35-41 ("My only agenda, at this point, is just to try to identify some of those imminent threats to public safety.").)

---

[7] Citations to government Exhibits 1 and 2, DVD recordings of the afternoon and evening interviews, refer to the time stamp found in the upper left corner of the video frame.

Pressed to be candid, Mr. Peace told Captain Mayton that his group had not intended to visit harm upon civilians and would have resorted to violence only to defend themselves if fired upon by police. (Gov't Ex. 1, at 2:46:23-57.) Professing that "human lives are sacrosanct, we're all Americans," Mr. Peace assured the Captain that their targets were infrastructure ("like power lines leading to a police station"), not persons. (Id. at 2:46:50-47:11.) Asked whether one of the plans had been to disable power lines connected to police stations, Mr. Peace answered that "nobody made any specific plans." (Id. at 2:47:14-23.) Other units were autonomous and would devise plans that were "right" for them. (See id. at 2:47:24-34.) As for his people, Mr. Peace claimed that they had planned to destroy armored police vehicles. He believed it was "ridiculous" for police stations to possess such apparatus; by blowing up armored vehicles he and his codefendants would "make a statement." (Id. at 2:48:11-37.) Because Mr. Peace had attempted to obtain shrapnel bombs, which are not used to demolish infrastructure, Captain Mayton expressed incredulity at Mr. Peace's protestation that he had not intended to harm human beings. (Id. at 2:47:53-48:03.)

Captain Mayton informed Mr. Peace that he knew defendants' operation was supposed to spur like-minded groups to rise up against the government. (Gov't Ex.

11

1, at 2:48:44-56; <u>see also</u> <u>id.</u> at 2:49:16-20 ("I know that you were the catalyst for all this; when you got started things were going to fall into place.").)  Impressing upon Mr. Peace the gravity of the situation ("The decisions you make right now are going to affect the rest of your life, the rest of your family's life."), the Captain related his fear that when other groups caught wind of Mr. Peace's arrest, they would carry out whatever attacks they had planned.  (<u>Id.</u> at 2:49:00-31.)  The officers warned Mr. Peace that, contrary to the humanitarian impulses he professed, other militias might actually intend to inflict harm on innocent persons.  In addition, destruction of infrastructure, although not motivated by a desire to harm the public, might be accomplished with a collateral body count.  (<u>Id.</u> at 2:49:32-50:00.)

While this plea to conscience did not impel Mr. Peace to surrender details of plans hatched by other militias, he did not outright decline to cooperate with law enforcement.  He instead pleaded ignorance; the groups he had communicated with had not discussed targets and he had "no idea what they had in mind or even if they would go through with" whatever they did have planned.  (Gov't Ex. 1, at 2:50:40-48.)  "You would think things . . . were organized," he added, "but unfortunately that's not the case."  (<u>Id.</u> at 2:50:50-54.)  In response to the Captain's many prompts, defendant was adamant that he did know the specific targets of other groups.  (<u>See</u>

id. at 2:57:44-58:11, 3:01:02-06, 3:02:11-21.) Nonetheless, Mr. Peace did not deny that these groups had planned to join his mission and had plans of their own.

Mr. Peace spoke about other militias in vague terms ("The largest group . . . is based out of Kansas, and they have people in Missouri, and Oklahoma."), but said that to provide the names of the militias and individuals affiliated with them he would need access to his computer. (Gov't Ex. 1, at 2:51:10-52:22; Tr. 47.) Mr. Peace attributed his inability to recall the information sought by the officers to a traumatic brain injury. "Things past 72 hours I have a hard problem remembering," he said. (Gov't Ex. 1, at 2:52:36-49.) He did recall that one of the largest militias had 300 members and were equipped with "the works": body armor, gas masks, helmets, weapons, pistols, and ammunition. (Id. at 2:53:00-24.) Mr. Peace stated that he had communicated with other militias primarily through Facebook and had used his email account to arrange transfers of supplies among them. (Id. at 2:53:39-56:22.) He denied meeting with anyone from other militias in person. (Id. at 2:57:51-58:10.)

Captain Mayton again voiced his concern that militias would react violently to word of Mr. Peace's capture. (See Gov't Ex. 1, at 2:59:07-56.) "I know . . . that the catalyst for them acting was you." (Id. at 2:59:26-34.) "Right," defendant said,

13

nodding.  (Id. at 2:59:35.)  When the Captain suggested that Mr. Peace was "at the top of the food chain," defendant replied "yes" and nodded again.  (Id. at 2:59:37-42; see also id. at 2:48:44-55 (Mr. Peace nodded when Captain Mayton described him as the catalyst of the anti-government revolt).)  "It's gonna happen," Captain Mayton said, pushing Mr. Peace to provide details about "upcoming events."  (Id. at 2:59:42-52.)  "If they find out that you're here, they're gonna move."  (Id. at 2:59:53-56.)  Mr. Peace felt that some of the militias would "run and hide" at the news because they were scared of "the Feds."  (Id. at 2:58:53-59:01, 3:00:17-31.)  He conceded, however, that he did not have "a good feel" for some other groups, which he described as a "giant question mark."  (Id. at 3:00:31-57.)

Several times, Mr. Peace informed the officers that he could provide them names and contact information of individuals in other militias if he had access to email and social media.  (See Gov't Ex. 1, at 2:52:03-07 ("I'd have to get my computer and look up names on there."); id. at 2:54:39-42 (stating that a particular militia leader's name is "on my Facebook"); id. at 2:55:55-58 ("I could look at my emails and tell you who it is.").)  Captain Mayton eventually asked Mr. Peace, "If we had your computer and we had it sitting here in front of you, you could whip all that stuff out?"  (Id. at 3:06:12-17.)  After Mr. Peace confirmed that he could, Captain

14

Mayton told Agent Harris that he was "not opposed to that if [they could] make that happen." (Id. at 3:06:18-31.) The two officers then exited the interview room. (Id. at 3:06:43-50; Tr. 13.)

When they reconvened the interrogation eight minutes later, at 3:14 p.m., FBI Intelligence Analyst Melvin Scott joined them. (Tr. 16-17, 40-41.) Captain Mayton and Agent Harris briefly questioned Mr. Peace about the persons living at his residence and dangers that officers could face executing a search warrant there.[8] (Id. at 14-15, 44; see Gov't Ex. 1, at 3:15:15-18:53.) From there, the officers segued into questions regarding the events that had precipitated Mr. Peace's arrest.

Because this line of questioning was not directed toward safeguarding the public from imminent threats, Agent Harris attempted to advise defendant of his Miranda rights. (Tr. 14, 44.) He explained to Mr. Peace:

> [W]e covered the emergency stuff that we think would prevent anybody from getting hurt in the immediate future, and you've been real forthcoming and I appreciate that and I feel safe speaking for him too. We're going to talk about what happened today, now. And you don't have to talk to us and I know you know your Miranda rights but I want to explain them to you. Anyway, you don't have to talk to us. If you

---

[8] In fact, law enforcement had begun the search of Mr. Peace's residence at 2:30 p.m. (Tr. 67.) Captain Mayton was not aware that the search warrant had already been executed by the time they questioned Mr. Peace about potential dangers lurking at his residence. (Id. at 51.)

15

do decide you want to talk to us—and I hope you do—if you just get uncomfortable for whatever reason and decide you don't want to talk to us, you can change your mind at any time and stop the conversation. Okay? With that said, do you agree to continue to talk to us about what happened today?

(Gov't Ex. 1, at 3:20:54-21:37.) Defendant replied that this was a "difficult" decision to make and asked Agent Harris what his questions were. (Id. at 3:21:41-52.) Agent Harris repeated that Mr. Peace was not obligated to talk:

Like I said, if you change your mind at any time . . . you can stop. Okay? I also have to tell you by law you have the absolute right to have an attorney with you while you're being questioned. When we are questioning you, again, if you start to feel uncomfortable and you think you want an attorney you can stop the interview at any time and say I want an attorney. Okay? . . . Those are your rights.

(Id. at 3:21:54-3:22:20.) Defendant then invoked his right to counsel. (See id. at 3:22:32-23:06; Tr. 45) Nonetheless, the agents continued to question Mr. Peace without an attorney present. (Tr. 17, 45-46.) The afternoon interview ended at 3:39 p.m. (Id. at 17-18.)[9]

As the interrogation neared its end, Captain Mayton invited Mr. Peace to continue their discussion at a later time: "If you change your mind and want to talk

---

[9] During the afternoon interview, law enforcement refrained from promising Mr. Peace any favors, did not force him to answer questions, and did not threaten him. (Tr. 18-19.) He was not handcuffed and was provided with water. (Id. at 14, 22-23.)

to us, you just need to reach out for us and let us know, okay?" (Gov't Ex. 1, at 3:25:29-35; Tr. 46.) Agent Harris echoed this sentiment by adding, "If you think of something while you're sitting in here that you think we need to know, I'm not asking you to tell us, you have a responsibility to tell us." (Gov't Ex. 1, at 3:26:08-18.) Before Mr. Peace was escorted from the interview room to a holding cell, Captain Mayton extended this parting invitation: "If you change your mind and want to talk, I'll be around . . . My name is Mark Mayton . . . and I'm with the Sheriff's Office. I'm a captain here." (Id. at 4:20:07-22; Tr. 46.)

### C.    The Evening Interview

Around 10:30 p.m. that same day, Agent Childers, having completed a search of Mr. Peace's residence, returned to the Bartow County Sheriff's Office. (Tr. 55.) After speaking with Mr. Cannon, Agent Childers was notified that Mr. Peace had requested to speak with law enforcement. (Id. at 55-57.) Agent Childers led Mr. Peace to the same room that Captain Mayton used to interview defendant in the afternoon. (Id. at 57, 69.) They were joined there by FBI Special Agent Chris Bower and Intel Analyst Scott. (Id. at 60.) Agent Childers began interviewing defendant shortly after 11:00 p.m. (Id.)

17

Initially, Agent Childers had Mr. Peace write a statement to explain why he had reached out to law enforcement. (Tr. 60, 70.) Mr. Peace penned the following on a sheet of lined paper: "I pushed button on wall and requested to speak. Eventually a deputy came and I told him I would like to speak with the Captain that interrogated me earlier [i.e., Mark Mayton]. After some time I was taken to see them." (Gov't Ex. 3; see also Gov't Ex. 2, at 11:02:04-05 (upon arriving in the interview room, Mr. Peace explained that he had asked to speak with Captain Mayton); Tr. 70.) Mr. Peace told law enforcement he was interested in cooperating. (Tr. 62-63.) Agent Childers notified defendant that they could not promise him anything in return for his cooperation, except to inform the prosecuting attorney that he had cooperated. (Id. at 63, 65.)

Although Captain Mayton had purported to conduct the afternoon interview under the public safety exception, Agent Childers determined that the emergency necessitating the use of the exception had ended. (Tr. 64, 68-69, 72.) Accordingly, Mr. Peace was advised of his Miranda rights. (Id. at 61, 72.) Mr. Peace signed an Advice of Rights form consenting to speak to officers without his attorney present. (Id. at 61-62, 72; Gov't Ex. 4.)

In many respects, the evening interview resembled the afternoon interview. "What we'd really, really be interested in maybe is some plots that are moving forward," Agent Childers began. "That's really the thing that we're very, very interested in . . . ." (Gov't Ex. 2, at 11:11:29-41; see also id. at 11:12:52-13:05 ("If you have any information about immediate type of things . . . that we really need to look at that maybe aren't the legal means of making change, that would be of great interest to us."); id. at 11:13:14-23 ("If there's any plots or anything that's going on that you know of or anything that we really need to look at, not maybe with your situation, but with other situations.").)    The evening interview ended at approximately 1:30 a.m. on February 16.  (See Gov't Ex. 2.)[10]

## D.    The Indictment

On March 12, 2014, the Grand Jury returned a single count Indictment [27] against defendants alleging their participation in a conspiracy to possess a destructive device not registered to them in the National Firearms Registration and Transfer Record, in violation of 18 U.S.C. § 371 and 26 U.S.C. §§ 5861(d) and 5871.

---

[10] As with the afternoon interview, during the evening interview Mr. Peace was provided with water, not handcuffed, not forced or threatened to answer questions, and did not appear to be under the influence of drugs or other intoxicants. (Tr. 59, 65-66.)

19

## II.    **APPLICABLE LAW**

### A.    ***Miranda v. Arizona***

The Fifth Amendment to the Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In <u>Miranda v. Arizona</u>, the Supreme Court found that the Fifth Amendment's privilege against self-incrimination is jeopardized "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." 384 U.S. at 478. To protect the privilege against the coercion inherent in custodial interrogations, the Court laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow." <u>Id.</u> at 442. These guidelines establish that "the admissibility in evidence of any statement given during custodial interrogation of a suspect [depends] on whether the police provided the suspect with four warnings." <u>Dickerson v. United States</u>, 530 U.S. 428, 436 (2000). Specifically, police must warn a suspect that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him." <u>Miranda</u>, 384 U.S. at 479.

20

The Court has described <u>Miranda</u> as a "prophylactic" rule, <u>see, e.g.</u>, <u>United States v. Patane</u>, 542 U.S. 630, 636 (2004), whose procedural safeguards are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected," <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974); <u>see also</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 306 (1985) (explaining that the <u>Miranda</u> exclusionary rule "may be triggered even in the absence of a Fifth Amendment violation"). Moreover, <u>Miranda</u> was not intended to "create a constitutional straightjacket." <u>Tucker</u>, 417 U.S. at 444 (quoting <u>Miranda</u>, 384 U.S. at 467). In <u>New York v. Quarles</u>, 467 U.S. 649 (1984), the Court relied on this flexibility in <u>Miranda</u> to carve out a public safety exception to its bright-line rule. <u>See</u> <u>United States v. Brady</u>, 819 F.2d 884, 887 (9th Cir. 1987) ("Inasmuch as the <u>Miranda</u> warning requirement is not a constitutional right, but rather a 'prophylactic' measure, exceptions are constitutionally permissible." (citations omitted)).

**B.    Public Safety Exception**

**1.    <u>*New York v. Quarles*</u>**

In <u>Quarles</u>, the Supreme Court crafted an exception to <u>Miranda</u> for situations where a suspect's silence may imminently endanger the public or police. After cornering a rape suspect in a supermarket, police found that the suspect, reported to

AO 72A
(Rev.8/82)

be armed, was wearing an empty holster.  467 U.S. at 651-52.  Without first giving him <u>Miranda</u> warnings, police asked Quarles where he had ditched the gun.  <u>Id.</u> at 652.  He responded, "the gun is over there," and gestured toward a stack of empty cartons.  <u>Id.</u>  Behind the cartons, police found a loaded revolver.  <u>Id.</u>

At Quarles's subsequent prosecution for possession of a weapon, the trial court excluded from evidence his statement about the gun, believing that police had violated <u>Miranda</u> by inquiring about the weapon's whereabouts before advising Quarles of his constitutional rights.  467 U.S. at 652-53.  New York's highest court affirmed the trial court's holding.  <u>Id.</u> at 653.

The Supreme Court took a different view.  First recognizing that Quarles made an incriminating statement in response to custodial interrogation—<u>Miranda</u>'s trigger—the Court held the police lawfully questioned Quarles without first reciting warnings because there is a "public safety" exception to <u>Miranda</u>.  467 U.S. at 655. The danger the missing gun posed was "obvious[]," the Court said; "an accomplice might make use of it, a customer or employee might later come upon it."  <u>Id.</u> at 657. The volatility of this situation did not strip Quarles of his core constitutional rights; <u>Quarles</u>, importantly, does not permit police to extract involuntary confessions in the name of public safety.  <u>See id.</u> at 655 n.5.  But because the cost of Quarles's silence

in this situation "would have been something more than merely the failure to obtain evidence useful in convicting Quarles," the Court refused to insist upon a roadblock to a waiver of his privilege against self-incrimination. Id. at 657. "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. In such a circumstance, if the police were to apprise a suspect of his right to remain silent it might discourage the suspect from divulging information that could help police neutralize the hazard. Id.

To the concurrence and dissent, the Quarles majority had done away with one of Miranda's most desirable features—its clarity. See 467 U.S. at 660 (O'Connor, J., concurring) ("[T]he Court has not provided sufficient justification for departing from [Miranda] or for blurring its now clear strictures."); id. at 674 (Marshall, J., dissenting) (faulting the majority for "condemn[ing] the American judiciary to a new era of post hoc inquiry into the propriety of custodial interrogations").[11] The

---

[11] Justice Marshall argued that Miranda itself sufficiently protects public safety. See Quarles, 467 U.S. at 686. "If a bomb is about to explode or the public is otherwise imminently imperiled, the police are free to interrogate suspects without advising them of their constitutional rights. . . . [N]othing in the Fifth Amendment or our decision in Miranda . . . proscribes this sort of emergency questioning. All the Fifth Amendment forbids is the introduction of coerced statements at trial." Id.

majority agreed that it had to some degree "lessen[ed] the desirable clarity of [Miranda]." Id. at 658.

Nonetheless, the Court did not provide much concrete guidance as to when the exception might apply, confident that "police officers [could] distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." 467 U.S. at 658-59; see also id. at 659 ("The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety."). The Court was clear that the subjective motivations of police do not govern the exception's application. Id. at 656. Rather, questioning within the exception must advance an "objectively reasonable need to protect the police or the public from an[] immediate danger." Id. at 659 n.8. And where there is "no exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime," police cannot rely on Quarles to sanitize un-warned interrogations. Id.[12]

---

[12] In Dickerson, the Supreme Court held that Miranda announced a constitutional rule of law. See 530 U.S. at 437-44. Therefore, as one circuit noted, "[t]he rationale supporting [the] public safety exception has been, to some degree,

## 2. Eleventh Circuit Authority

The Eleventh Circuit has addressed the public safety exception three times, twice in published opinions.  In <u>United States v. Newsome</u>, 475 F.3d 1221 (11th Cir. 2007) (per curiam), the defendant was the prime suspect in the non-fatal shooting of his wife and child.  <u>Id.</u> at 1222.  Because the officers who traveled to a motel to apprehend Newsome knew that he was a violent offender and possibly in the possession of a gun, they vacated the surrounding motel rooms and entered the room the defendant had rented with their guns drawn.  <u>Id.</u> at 1223.  Having handcuffed Newsome, one officer, before <u>Miranda</u> rights were read, asked Newsome if there was "anything or anyone in the room that [he] should know about."  <u>Id.</u>  (alteration in original).  The defendant directed police to a pistol.  <u>Id.</u>

The Circuit found that the public safety exception applied, explaining that because officers were aware that at least two people were in Newsome's motel room they had reason to fear an ambush.  475 F.3d at 1225.  "The officers reasonably believed that they were in danger, and they acted accordingly to protect themselves and other motel guests in making the arrest."  <u>Id.</u>  The Circuit noted that the officer

_____

called into question by <u>Dickerson</u>."  <u>Allen v. Roe</u>, 305 F.3d 1046, 1050 n.4 (9th Cir. 2002).

asked only what was necessary to secure the scene. The broad phrasing of the question was not problematic because "[a]n officer is not expected to craft a perfect question in the heat of the moment." Id.

The Circuit again addressed the exception in United States v. Smith, 322 F. App'x 876 (11th Cir. 2009) (per curiam), where police confronted the defendant after a car accident in the parking lot of a gas station late at night. Id. at 878. The officer, who noticed that the defendant was agitated and reeked of alcohol, asked him—without giving Miranda warnings—if he had any weapons on him. Id. Smith responded that he had a gun in his car. Id. The Circuit concluded that the officer's question was permissible under the public safety exception, because "[i]t was reasonable for the officer to ask Smith about weapons to protect his own safety and that of others in the area based on Smith's agitation and his strong odor of alcohol." Id.

Most recently, in United States v. Spoerke, 568 F.3d 1236 (11th Cir. 2009), an officer pulled over a vehicle carrying what he suspected to be improvised explosive devices. Id. at 1241. Before advising the suspect of his Miranda rights, the officer inquired what the devices were (pipe bombs, Spoerke responded) and what materials were used to make the bombs. Id. The Eleventh Circuit did not find

26

extensive analysis necessary to conclude that "[t]he threat posed by two pipe bombs in a vehicle on a city street" outweighs the need for <u>Miranda</u> warnings. <u>Id.</u> at 1249.

## C. Suppression of Postwarning Statements

In <u>Oregon v. Elstad</u>, the Supreme Court was required to decide whether an initial failure of law enforcement officers to administer <u>Miranda</u> warnings tainted subsequent admissions made after the suspect was fully advised of and waived his rights. 470 U.S. at 300. Arguments favoring suppression of the later confession relied heavily on the Fourth Amendment "tainted fruit of the poisonous tree" doctrine. <u>Id.</u> at 303. However, underscoring fundamental differences between the function of <u>Miranda</u> and the role of the Fourth Amendment exclusionary rule, the Court held that <u>Miranda</u> "does not require that the statements and their fruits be discarded as inherently tainted." <u>Id.</u> at 306-07.

> It is an unwarranted extension of <u>Miranda</u> to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though <u>Miranda</u> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

<u>Id.</u> at 309.

AO 72A
(Rev.8/82)

The Supreme Court refined <u>Elstad</u>'s holding in <u>Missouri v. Seibert</u>, which tested this two-step police protocol for custodial interrogation: (1) provide no warnings until the interrogation has produced a confession, and (2) follow the confession with <u>Miranda</u> warnings and lead the suspect "to cover the same ground a second time." 542 U.S. at 604. As the government notes (<u>see</u> Gov't Resp. 14), because <u>Seibert</u> did not produce a majority opinion, the concurrence of Justice Kennedy controls. <u>See</u> <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .") (internal quotation marks and citation omitted); <u>United States v. Street</u>, 472 F.3d 1298, 1313 (11th Cir. 2006) ("Because <u>Seibert</u> is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law.").

In his concurrence, Justice Kennedy asserted his opinion that <u>Elstad</u> was "correct in its reasoning and its result." <u>Seibert</u>, 542 U.S. at 620. However, <u>Seibert</u> raised new considerations; unlike the accidental violation in <u>Elstad</u>, police had used a question-first technique based on a deliberate violation of <u>Miranda.</u> <u>Id.</u> Such a

28

tactic, Justice Kennedy found, frustrates the purpose of <u>Miranda</u> and "creates too high a risk that postwarning statements will be obtained when a suspect was deprived of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." <u>Id.</u> at 621 (internal quotation marks and citation omitted). Thus, suppression of a post-warning confession is an appropriate remedy if (1) "the two-step interrogation technique [is] used in a calculated way to undermine the <u>Miranda</u> warning" and (2) law enforcement did not then take measures to cure the defect. <u>Id.</u> at 621-22. Curative measures are those "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the <u>Miranda</u> warning and of the <u>Miranda</u> waiver." <u>Id.</u> at 622. In the absence of a deliberate two-step strategy, <u>Elstad</u> governs the admissibility of postwarning statements. <u>Id.</u>

In contrast, the plurality's approach conditioned the admissibility of postwarning statements on "whether <u>Miranda</u> warnings delivered midstream could be effective enough to accomplish their object." <u>Seibert</u>, 542 U.S. at 615. In determining whether <u>Miranda</u> warnings "delivered midstream could be effective enough to accomplish their object," the plurality would have courts consider these factors: "the completeness and detail of the questions and answers in the first round

of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id.[13]

## III. **ANALYSIS**

Mr. Peace moves the Court to suppress both sets of statements he made to police on February 15, 2014. First, he argues that the afternoon interview cannot be salvaged by the public safety exception. (Def.'s Br. 23-29; Def.'s Reply 1-2.) Assuming law enforcement had recourse to that narrow Miranda exception, he contends that so much of the interrogation strayed beyond its boundaries that "it is impossible to separate the strands of the dialogue that were aimed at preventing exigent harm from those illustrating the crime for which Mr. Peace sat arrest[ed] and jailed." (Def.'s Br. 29-33.) Second, Mr. Peace argues that statements he made during the evening interview, which followed a voluntary and knowing waiver of his Miranda rights, must be suppressed because the violations of the afternoon interview

---

[13] Although the plurality opinion is not controlling law, the Eleventh Circuit has used these same factors to determine whether law enforcement employed an impermissible question-first tactic. Street, 472 F.3d at 1314.

incurably tainted the entire evening interview under <u>Seibert</u>.  (<u>Id.</u> at 33-40; Def.'s

Reply 3.)

The government bears the burden of showing that Mr. Peace's in-custody

statements were obtained in compliance with <u>Miranda</u> and otherwise voluntary, or

whether some exception to the <u>Miranda</u> rule applies.  <u>See</u> <u>United States v. Chaidez-</u>

<u>Reyes</u>, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014).  Conceding that Mr. Peace

unequivocally invoked his <u>Miranda</u> rights after Agent Harris's warnings, the

government will not introduce in its case-in-chief statements from the afternoon

session after Mr. Peace invoked his right to have an attorney present during

questioning (i.e., between 3:14 p.m. and 3:39 p.m).  (Gov't Resp. 5 nn.1-2; <u>see</u> <u>supra</u>

note 1.)  The government argues that statements made at any other point during the

afternoon interview are admissible under <u>Quarles</u>, and that <u>Seibert</u> does not dictate

the suppression of statements Mr. Peace gave during the evening interview.  (Gov't

Resp. 7-17.)

A.    **Agents Lawfully Conducted the Afternoon Interview Under the Public Safety Exception to *Miranda***

Most cases finding that a custodial interrogation was lawfully conducted under

the public safety exception, like its progenitor, have involved a firearm or other

31

dangerous instrumentality in propinquity to the suspect or arresting officers, and one or a few spur-of-the-moment questions. Defendant repeatedly highlights how the instant scenario is different from the classic use of the public safety exception. (See, e.g., Def.'s Br. 28 (depicting Mr. Peace's interrogation as "far afield of the narrow territory marked by the Quarles opinion"); id. at 30-31 ("The Eleventh Circuit has never applied the public safety exception to a case where the facts show a prolonged interrogation on a broad range of topics."). Indeed, police here subjected defendant to a lengthy, pre-planned interrogation, which was intended to neutralize a less defined, less isolated threat than a gun or other dangerous instrumentality located within the vicinity of the suspect and officers.

Another noteworthy feature of the first issue presented is its relevance to a heated public debate that has arisen in the wake of high-profile, post-9/11 terrorist plots: How does, or how should, Miranda fit into the Nation's efforts to combat terror attacks? Notwithstanding the attention and divergent views of legal scholars, politicians, and journalists,[14] the courts have had scarce opportunity to rule on the

---

[14] See, e.g., Geoffrey Corn & Chris Jenks, Strange Bedfellows: How Expanding the Public Exception to Miranda Benefits Counterterrorism Suspects, 41 Fordham Urb. L.J. 1 (2013); Amos N. Guiora, Relearning Lessons of History: Miranda and Counterterrorism, 71 La. L. Rev. 1147 (2011).

admissibility of statements obtained from a public safety interrogation intended to intercept terrorist threats. (<u>See</u> Def.'s Br. 31 (noting the absence of authority on this issue).)

Going forward, the undersigned is mindful that the law does not deal in catchwords. While Mr. Peace and his codefendants planned to use violence to make a political statement, terroristic intentions alone do not justify the use of the public safety exception, if, once the perpetrators of a plot are apprehended, the danger to the public or police has evaporated. <u>Quarles</u> does not drape a blanket over any class of cases (i.e., those that bear upon national security), but demands a case-by-case analysis. <u>See</u> <u>Quarles</u>, 467 U.S. at 655; <u>see also</u> <u>United States v. Estrada</u>, 430 F.3d 606, 613 (2d Cir. 2005) (the public safety exception is a "function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case" (internal quotation marks and citation omitted)).

Although this case differs in several respects from the "loose firearm" scenario, the instant case finds a helpful comparator in that of Umar Farouk Abdulmutallab, the man popularly known as the "Underwear Bomber." On Christmas Day 2009, as Northwest Airlines Flight 253 from Amsterdam was on its

33

final descent into Detroit, Abdulmutallab tried but failed to detonate plastic explosives sewn inside his underwear. United States v. Abdulmutallab, No. 10-20005, 2011 WL 4345243, at *1 (E.D. Mich. Sept. 16, 2011); United States v. Abdulmutallab, 739 F.3d 891, 895 (6th Cir. 2014). After the plane landed safely, the defendant was taken to the hospital to receive treatment for third degree burns he had suffered when the explosives malfunctioned. 2011 WL 4345243, at *1. About three hours after his arrival at the hospital, FBI agents questioned the defendant without providing Miranda warnings. Id. "Mindful of [his] self-proclaimed association with al-Qaeda and knowing the group's past history of large, coordinated plots and attacks, the agents feared that there could be additional, imminent aircraft attacks in the United States and elsewhere in the world." Id. Thus, the agents asked Abdulmutallab about "where he traveled, when he had traveled, how, and with whom; the details of the explosive device; the details regarding the bomb-maker, including where [he] had received the bomb; his intentions in attacking Flight 253; who else might be planning an attack; whether he associated with, lived with, or attended the same mosque with others who had a similar mind-set as [the d]efendant about jihad, martyrdom, support for al-Qaeda, and a desire to attack the United States by using a similar explosive device on a plane, and what these individuals looked

34

like." Id. at *5. In response to a motion to suppress, the court found that the un-warned interrogation was "fully justified" by the public safety exception. Id. at *6.

The officer's interrogation of Mr. Peace can be distinguished from Abdulmutallab's because the government does not claim that, like al-Qaeda, the anti-government militias with whom Mr. Peace communicated have a history of executing coordinated terrorist attacks. However, FBI agents had no need to infer a threat to public safety here, as they did in Abdulmutallab, because they had evidence that defendants were actively promoting a multifaceted terror operation, one of such scale it was intended to trigger the institution of martial law. Therefore, law enforcement had reason to believe that defendants were planning something catastrophic.

Stepping inside the interview room on the afternoon of February 15, 2014, Captain Mayton and Agent Harris were aware of these important facts: (1) Mr. Peace and his codefendants had just tried to get their hands on more than a dozen explosive devices; (2) they had been communicating via the Internet with individuals who shared their misgivings about the government and a willingness to address what injustices they perceived through premeditated violence; and (3) as soon as

35

defendants commenced their attacks, the clock would start running for other militias to carry out attacks of their own initiatives.

Based on this information, law enforcement had an objectively reasonable basis to (1) fear that other militias would fill the vacuum created by defendants' apprehension and quickly perpetrate terror plots before police had the chance to preempt them, and (2) think that Mr. Peace held information that could prove useful in thwarting operations against infrastructure, police, and civilians. As in Quarles, where officers "were confronted with the immediate necessity" of locating a loose and loaded revolver, 467 U.S. at 657, officers here were confronted with the immediate necessity of uncovering the plans of other militant, anti-government groups.

Albeit factually distinct, Quarles and this case raise identical concerns. Like a loaded revolver jettisoned in a public place, a terrorist plot, whether of foreign or domestic origin, whether motivated by jihad or a secular grievance with government, presents a grave threat to public safety. As such, Captain Mayton and Agent Harris lawfully questioned Mr. Peace, the putative fomenter of a violent revolt, about other militias, their members, their locations, and their plans, without first reading him

36

<u>Miranda</u> rights. Their interrogation falls within the scope of the public safety exception.

Mr. Peace resists this outcome. First, he argues that Captain Mayton made a fatal concession when he testified that the afternoon interview was purposed to prevent violent events that could happen in the future. (Def.'s Br. 23-24.) "[F]or even by his own terms," defendant writes, "the agent was not aiming to solve a contemporaneous, in-progress emergency, but only prospective harm. This set of facts is jarringly dissonant with the underlying spirit, and letter, of the <u>Quarles</u> opinion itself." (<u>Id.</u>)

The <u>Quarles</u> exception is temporally bound; the danger that the interrogation seeks to prevent must be "immediate." <u>Quarles</u>, 467 U.S. at 657, 659 n.8. However, by contrasting the potential, future threat of harm in this case to the supposedly actual and present threat confronted by officers in <u>Quarles</u>, defendant has invented an untenable distinction, because the very nature of a public safety threat is prospective. In <u>Quarles</u>, law enforcement confronted the <u>possibility</u> that someone in the near <u>future</u> would stumble upon the discarded firearm and misuse it. Likewise, the officers who interviewed Mr. Peace faced the possibility that militant groups would perpetrate violence within a period of hours. For purposes of the public safety

37

exception, there is no difference between a gun waiting to fall into the wrong hands and a cluster of militias waiting to launch a guerilla war. Notably, there is no language in Quarles to suggest it is geographically bound. The fact that other militias were operating in other states does not lessen the exigency.

Defendant also attempts to heighten the Quarles standard by quoting from its dissent, where Justice Marshall writes that officers are free to question suspects when a "bomb is about to explode." (Def.'s Br. 21 (quoting 467 U.S. at 686).) Justice Marshall, however, was not characterizing the narrowness of the majority's holding. He was making the point that Miranda does not prohibit questioning about a ticking time bomb or anything else, but only the admission into evidence of unwarned statements. (See supra note 11.) In his unadopted view, if police need information to defuse a public safety threat, they should do their duty to the public and ask—and the courts should do theirs to the Constitution and suppress.

Second, Mr. Peace argues that the police behaved in a manner belying the existence of an emergency. (Def.'s Br. 5-7, 24-25.) Defendant first wonders why police would wait seventy minutes to question the "criminal who was thought to represent a tipping point in an imminent and disastrous period of public violence, who was then believed to hold in his mind a catalog of names and places critical for

38

law enforcement to neutralize the danger." (Id. at 6.) After all, could police not have questioned Mr. Peace in the Walmart parking lot, in the backseat of the patrol car en route to the jail, or from the second he was seated in the interview room? (See id. at 5-6.) He also points out that the officers never provided him with a computer, which, according to Mr. Peace, contained some of the information officers were seeking. (Id. at 27-28.)

This argument takes aim at the subjective motivations of the questioning officers, which are not accounted for under the objective standard established in Quarles. See United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008) ("The exception does not depend upon the subjective motivation of the questioning officers. Instead, the Court adopted an objective standard: the exception applies when 'police officers ask questions reasonably prompted by a concern for the public safety.'" (quoting Quarles, 467 U.S. at 656)). Therefore, when Mr. Peace contends that the officers' actions—delaying the interrogation, not offering him a computer—show they "did not believe . . . that [the interrogation] was necessary" to prevent a threat to public safety, he is stating an irrelevancy. (See Def's Br. 24.)

Moreover, the officers' actions did not betray a lack of urgency. After defendants were taken into custody, searched, brought to the Sheriff's Office, and

seated in interview rooms, only forty additional minutes passed before Captain

Mayton began questioning Mr. Peace. The undersigned declines to presume that

officers frittered away this time. Given the intricacy of the FBI's investigation and

the operation in the Walmart parking lot—which defendant dramatically describes

as an operation with many moving parts (see Def.'s Br. 25)—law enforcement

apparently had related issues to address. Captain Mayton apologized for the delay

to Agent Harris when he entered the interview room, explaining that he had been

working out "some logistics." (Gov't Ex. 1, at 2:44:33-35.) In other cases,

equivalent passages of time between arrest and questioning have not barred reliance

on the public safety exception. See, e.g., United States v. Ferguson, 702 F.3d 89, 96

(2d Cir. 2012) (exception applied where interrogation occurred sixty to ninety

minutes after the defendant's arrest, because this "brief[] amount of time did not

diminish the officers' objectively reasonable need to protect the public" from an

imminent threat); Allen, 305 F.3d at 1051 (rejecting the defendant's argument that

the "significant" amount of time between the shooting and the suspect's questioning

as to the location of the gun meant that there ceased to be immediate danger to the

public; holding instead that "[i]f the gun was discarded in a public place, it posed a

40

continuing immediate danger because anyone could have found the gun at any time").

Concerning the trove of useful information Mr. Peace promised to unveil if given a computer, there are several reasons other than a lack of urgency why the police may have declined to pursue that avenue. For one, the officers proposed providing Mr. Peace with a computer shortly before they transitioned from a public safety interrogation to standard questioning about defendant's crime. Since the officers determined no longer to question Mr. Peace under the public safety exception, they had no immediate need to access that information. In addition, handing Mr. Peace a computer or other device with Internet access involved a fair amount of risk. Granted the opportunity to access his email and social media accounts, defendant could have deleted incriminating information or sent an alert to other militias. Captain Mayton and Agent Harris may have decided that an evidentiary search of Mr. Peace's Internet accounts was better left to the forensics experts.

Finally, Mr. Peace wrongly asserts that the public safety threat was "predicated entirely upon [his] <u>successful</u> purchase of pipe bombs," and thus when defendants were arrested the "fear of future harm [was] greatly diminished, if not entirely

undone." (Def.'s Br. 4-5, 25.)  As made clear throughout the afternoon interview, law enforcement's fear was predicated on the possibility that militias, hearing of defendants' arrest, would set out to finish what Mr. Peace had begun.  Mr. Peace points out that he and his codefendants were "held at the jail incommunicado from the rest of the world" (id. at 25), but there are other ways the militias could have learned about defendants' arrest.  Someone living at Mr. Peace's residence could have alerted them, and word of defendants' arrest was rapidly spread by news outlets and social media.  See, e.g., Rodney Thrash, 3 in custody after FBI operation in Cartersville, Atlanta J.-Const., Feb. 15, 2014 (noting that reports about the FBI operation had surfaced on Twitter).  Furthermore, if Mr. Peace's catalyzing operation did not transpire at the appointed time, another militia, whether or not it knew the cause of his failure to act, might decide to become the catalyst in defendant's stead. Although defendant now argues that any threat to public safety was undone by his arrest, he did not convey the same assurance during his interview, where he described other militias as "giant question mark[s]."  In summary, Captain Mayton and Agent Harris did not violate Miranda by relying on the public safety exception to question Mr. Peace without warnings.

42

**B.      Questions Asked During the Afternoon Interview Did Not Exceed the Scope of a Valid Public Safety Interview**

Assuming that the public safety exception permitted law enforcement to interrogate Mr. Peace without the benefit of <u>Miranda</u> warnings, he argues that "much of the question-and-answer session strayed far beyond" the perceived future threat by other militias.  (Def.'s Br. 29-33.)  In <u>Quarles</u>, the Supreme Court noted that the public safety exception is "circumscribed by the exigency which justifies it."  467 U.S. at 658.  Thus, questions posed in a public safety inquiry must be "necessary to secure [the officers'] own safety or the safety of the public," and may not be "designed solely to elicit testimonial evidence from a suspect."  <u>Id.</u> at 659; <u>see also</u> <u>United States v. Laughlin</u>, No. 1:10-CR-113-TWT/AJB, 2012 WL 3065404, at *22 (N.D. Ga. July 6, 2012).  "[T]o fall within the exception, a question must have some rational relationship to defusing the perceived danger."  <u>United States v. Henry</u>, 939 F. Supp. 2d 1279, 1297 (N.D. Ga. 2013).

Defendant objects to the general tenor of the interview, but he also particularly quarrels with three statements.  First, early in the interview, Captain Mayton told Mr. Peace that he needed to be "very forthcoming . . . about what <u>the</u> plans were." (Def.'s Br. 29 (quoting Gov't Ex. 1, at 2:46:15-19) (emphasis added).)  He argues

that this "open-ended query could only have induced [him], as it did, to talk about himself and his co-defendants and the very crime" for which he stands charged. (<u>Id.</u> at 29-30.) The query can be viewed as open-ended, however, only if lifted from its context. In the minutes preceding this prompt, Captain Mayton spelled out to Mr. Peace twice that his crime (what "happened today") did not interest him, and that his questions targeted future harm and threats to the public that police had not already neutralized. (<u>See</u> Gov't Ex. 1, at 2:44:57-46:12.) Given this explanatory preface, Captain Mayton's query is not open to interpretation. And as the Eleventh Circuit stated in <u>Newsome</u>, "[a]n officer is not expected to craft a perfect question in the heat of the moment." 475 F.3d at 1225.

> The fact that the question was also broad enough to elicit other information does not prevent application of the public safety exception when safety was at issue. . . . [C]onditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to the <u>Quarles</u> Court's decision that an officer may forego announcement of Miranda warnings when public safety is threatened.

<u>United States v. Williams</u>, 181 F.3d 945, 953 n.13 (8th Cir. 1999).

The next query challenged—"If you can't tell me anything about [other militia groups'] targets, tell me about your targets" (Def.'s Br. 30 (quoting Gov't Ex. 1, at 2:58:14-19))—also lies within the contours of a valid public safety interview. Before

44

Mr. Peace could fully answer, Captain Mayton stopped him to explain the purpose of this prompt:  to ensure that no one else could carry out attacks against those targets.  (See Gov't Ex. 1, at 2:58:31-42.)  This query was rationally related to defusing the perceived danger.  The FBI possessed evidence that defendants were acting in concert with other militias.  The disparate groups might well have jointly pursued the same or similar targets.  Even if the militias had planned to act as separate units, a specific target that Mr. Peace and his codefendants had claimed as their own might have been so central to the overall scheme (for example, FEMA headquarters in Washington, D.C.) that one of the other militias, in the event of defendants' incapacity, would have assumed responsibility for destroying it.

Finally, defendant objects to Intel Analyst Scott's question, "You provide [the militia with] weapons?"  (Def.'s Br. 32 (quoting Gov't Ex. 1, at 3:30:58-31:08).)  The Court need not decide whether this question exceeded the bounds of Quarles because the government will not seek to introduce Mr. Peace's response at trial.  (See supra note 1.)

To argue that the questions asked were "out of bounds," Mr. Peace relies on United States v. Rogers, Criminal No. 13-130 ADM/JJG, 2013 WL 6388457 (D. Minn. Dec. 6, 2013).  (See Def.'s Br. 31-33.)  In Rogers, the FBI learned that the

45

defendant and others were planning to destroy a radio tower, raid a National Guard armory, and attack a police station. 2013 WL 6388457, at *1. Officers executing a search warrant at the defendant's property found several explosive devices. Id. Without advising him of his Miranda rights, an FBI agent questioned Rogers "about the location of any other explosives, whether [he] had made the devices and how they were made, the nature and extent of the plot, and whether others might be involved in planning the attack." Id. at *1-2. As the interrogation unfolded, the agent relayed information to bomb technicians and agents at the scene. Id. at *2.

Although much of the interrogation did fall under Quarles, the court held that the agent veered into a line of questioning that did not comport with the public safety exception when he "posed questions to Rogers about when he handled firearms" and "honed in on when Rogers may have handled the gun in relation to when he was placed on probation for a prior offense." 2013 WL 6388457, at *4. These questions were not motivated by exigent circumstances because the firearms in question, secured by police, presented no danger to the police officers or the public. Id. at *4-5. Those questions were rather "an experienced investigators' [sic] effort to have Rogers admit a key element of possession of a firearm by a convicted felon." Id. at *4.

46

Rogers is instructive, but not in the way defendant contends. The agent's inquiries about the defendant's firearms had no reasonable nexus to defusing an ongoing threat, since the firearms were all secured. Here, while the officers' questions had the collateral effect of furnishing the government with testimonial evidence, every question asked before 3:06 p.m. addressed the perceived threat of other militant organizations. Nothing bars police from asking questions that could, in addition to their primary purpose to safeguard the public, help them build a case against a defendant. See Quarles, 467 U.S. at 657 ("[The officer] needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area."). For these reasons, the questions asked during the afternoon interview did not exceed the scope of a valid public safety interview.

### C. The Statements Obtained During the Evening Interview Should Not be Suppressed Under *Seibert*

Mr. Peace next argues that statements he made during the evening interview, although they followed an adequate recitation of his Miranda rights and a voluntary and knowing waiver of those rights, should be suppressed under Seibert. (Def.'s Br. 33-40.) To place this case in Seibert's court, he observes that officers' failure to

47

provide him <u>Miranda</u> warnings was not "hapless or inadvertent, but was intentional and calculated." (<u>Id.</u> at 35.) This argument misreads <u>Seibert</u>, which expressed disapproval of a deliberate interrogation tactic intended to undermine the purpose of <u>Miranda</u> warnings. An officer's decision to withhold warnings based on his interpretation of judicial precedent—even a faulty interpretation—is not the equivalent of the cunning question-first scheme that the police in <u>Seibert</u> routinely employed. <u>See</u> <u>United States v. Moore</u>, 670 F.3d 222, 231 (2d Cir. 2012) ("[U]ndoubted public safety considerations plausibly account for the conduct of the police in a way that militates against finding that the first interview was a premeditated attempt to <u>evade</u> <u>Miranda</u>."); <u>United States v. Hernandez</u>, 751 F.3d 538, 542 (11th Cir. 2014) (where interrogation was within the public safety exception, it could not form the basis of a <u>Seibert</u> violation). Indeed, defendant, on his own volition, requested to reinitiate a dialogue with law enforcement. It is doubtful that the evening interview would have occurred had Mr. Peace not willingly reached out in the spirit of cooperation. This is clearly not a <u>Seibert</u> case, and defendant is not entitled to the suppression of statements he voluntarily made to police after a knowing and voluntary waiver of his <u>Miranda</u> rights.

48

## IV.  CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [45] be **DENIED**.  Further, the undersigned **RECOMMENDS** that the Court **DENY AS MOOT** defendant's Motion to Suppress Evidence Resulting from Execution of Search Warrant [46, 56].

**SO RECOMMENDED**, this 25th day of September, 2014.


_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)